IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, NORFOLK DIVISION

JENNIFER WILSON,

PRO SE PLAINTIFF,

V.

CONDUENT, VERIZON BENEFITS
CENTER and BRISTOL-MYERS SQUIBB,

DEFENDANT

## **Complaint**

 The plaintiff has standing to bring her claim because Conduent, Verizon Benefits Center (Verizon) and Bristol-Myers Squibb (BSM) threaten an immediate and irreparable denial of the plaintiffs' rights. **Conduent** delivers business process outsourcing (BPO) solutions that ignite efficiency, savings, and revenue growth across industries. Verizon Benefits Center is a company within Conduent and also Bristol-Meyers Squibb is also a company within Conduent. In Virginia, employment relationships are presumed to be "at will," which means that the employment term extends for an indefinite period and may be terminated by either party for any reason, or no reason at all, upon reasonable notice. "Upon reasonable notice" is what is also at hand. Virginia courts "have strenuously adhered" to the presumption of employment at-will employment. *See Nguyen v. CNA Corp.*, 44 F.3d 234, 237-38 (4th Cir. 1995). Virginia courts have relied on an underlying theory that stresses the freedom of contract: "An employee is

*Jennifer Wilson* 12/2/2022

ordinarily at liberty to leave his employment for any reason or for no reason, upon giving reasonable notice, without incurring liability to his employer." *Miller v. SEVAMP, Inc.*, 362 S.E.2d 915, 917 (Va. 1987). The employment-at-will policy was violated when they chose to fire the Plaintiff. This right was conferred on the employee by statute, and the employer's termination of employment violated the public policy underlying that right. Verizon and Bristol-Myers Squibb violated the public policy underlying the rights conferred to her in the protected order statutes. With a firing policy in place given by Conduent, the state's at will policy does not apply.  There is discrimination in just about every place you go in the world. But a least in the U.S change is happening and the nation is continuing to make progress every single day. Now a lot of times you have to fight for change to happen, and change does not happen unless you say that what is happening to you is unacceptable. You have to sort of teach people to love and respect your right to live like everyone else. The nation is working together and part of working together is enforcing the laws in place. The plaintiff will show that her termination violated that stated public policy of protection of health and safety. The public policy is "designed to protect property rights, personal freedoms, health, safety or welfare of the people in general." *Lockhart v. Commonwealth Educ. Sys. Corp.,* 247 Va. 98, 104, 439 S.E.2d 328, 331 (1994). Verizon and Bristol-Myers Squibb violated what the employment at-will policy was designed to do. Therefore, the employers are liable for wrongful discharge after it had terminated plaintiff in violation of public policy. The plaintiff was discharged in violation of public policy embodied in Virginia's protective order statutes. Even though only one company can fire an employee, both were responsible for firing Ms. Wilson. It was a tag-team, where in wrestling one person knocks someone down and the other one is tagged to finish the wrestler off. That is where defamation comes into play.

 Plaintiff Jennifer Wilson, Pro Se, brings this action on behalf of herself. She respectfully comes before this honorable court in the instant cause as a Pro Se litigant, Plaintiff relied on Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991), where the Court stated that:
"A Pro Se litigant's pleading are to be construed liberally and to a less stringent standard than formal pleadings drafted by lawyers…If a Court can reasonably read the pleadings to state a valid claim on which Plaintiff could prevail, it should do so despite the Plaintiff's failure to site proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction or his unfamiliarity with pleading requirements" (Citation Omitted)." See also Riley v. Greene, 149 F. Supp. 2d 1256 (D. Colo. 2001). The court must also consider the plaintiffs' complaint in its entirety when evaluating a motion to dismiss for failure to state claim. Because the plaintiff is proceeding pro se, her complaint should be construed liberally. See Hartmann v. Carroll, 492 F.3d 478, 482 n.8 (3d Cir. 2007). The Plaintiff has gone through all the administrative processes and is now trying to receive due process.

Beginning with Bowman v. State Bank of Keysville, 229 Va. 534, 331 S.E.2d 797 (1985), we have recognized a narrow public policy exception to this Commonwealth's employment-at-will doctrine, which ordinarily permits either the employer or the employee to terminate the employment relationship without incurring liability. She has explained that this exception applies to discharges which violate public policy. See Lawrence Chrysler Plymouth Corp. v. Brooks, 251 Va. 94, 98-99, 465 S.E.2d 806, 809 (1996). She also has explained that the cause of action arises not from the statute or statutes which express the public policy relied on by the employee, but from the narrow exception within the common law recognized in Bowman. See Bailey v.

Scott-Gallaher, 253 Va. 121, 125, 480 S.E.2d 502, 504 (1997); Lockhart v. Commonwealth Educ. Systems Corp., 247 Va. 98, 105, 439 S.E.2d 328, 331 (1994). Upon these principles, we have permitted former at-will employees to maintain common law actions for wrongful discharge under the narrow exception recognized in Bowman where the conduct alleged would have violated Virginia's public policy against race discrimination as reflected in the Virginia employment at-will policy and you can also check the Virginia Human Rights Act (VHRA), Code §§ 2.1- 715. The Plaintiff will state the claim even though, "a complaint motion does not need detailed factual allegations;" however, (F)actual allegations must be enough to raise a right to relief above the speculative level." Id., quoting from, Bell Atlantic Corp. V. Twombly, 550 U.S. 544, 555 (2007). The complaint must be "plausible on its face" and must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Mancinni v. Broward County Sheriff, 2014 WL 7792953, *2 (S.D. Fla., October 21, 2014), citing, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(quotations omitted); Covey v. Assessor of Ohio County, 777 F.3d 186, 192 ; Sinclair, at *3. In re Vitamins Antitrust Litigation, 217 F.R.D. 30, 32 (D.D.C. 2003), The Supreme Court explained that "if the underlying facts or circumstances relied upon by a plaintiff may be a proper source of relief, he ought to be afforded an opportunity to test his claim on the merits." Foman, 371 U.S. at 182. In fact, the underlying reason this complaint should not be dismissed is "because [the] Federal Rules suggest [that the] 'artless drafting of a complaint should not allow for the artful dodging of a claim.'" Driscoll v. George Washington Case 1:13-cv-00037-KBJ Document 23 Filed 07/30/13 Page 3 of 6 4 Univ., No. 12-0690, 2012 U.S. Dist. LEXIS 127870, at *7 (D.D.C. Sept. 10, 2012) (alteration in original) (quoting Poloron Prods., Inc. v. Lybrand Ross Bros. & Montgomery, 72 F.R.D. 556, 561 (S.D.N.Y. 1976)). Indeed, Ms. Wilson's complaint is not "a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading. . . ." FED.R.CIV.P. 12(e). In *Bell Atlantic Corp. v. Twombly*, *550 U.S. 544* (2007), the Supreme Court concluded, in an antitrust case, that a complaint which provides only "fair notice" of a claim is insufficient. In addition to providing notice, the complaint must state a claim to relief that is plausible on its face. The plaintiff's factual allegations must be enough to demonstrate a right to relief above the speculative level. The Court reasoned that the need at the pleading stage for allegations plausibly suggesting (not merely consistent with) success on the claim reflects the threshold requirement of F. R. Civ. P. Rule 8(a)(2) that the "plain statement" possess enough heft to show that the pleader is entitled to relief. In a later case, *Ashcroft v. Iqbal*, _ U.S. _ , *129 S. Ct. 1937* (2009), the Supreme Court held that the "plausibility" standard applies to all civil actions. In *Swierkiewicz,* the Supreme Court held that "an employment discrimination plaintiff need not plead a prima facie case of discrimination ... to survive [a] motion to dismiss," 534 U.S. at 515, 122 S.Ct. 992, because "[t]he prima facie case ... is an evidentiary standard, not a pleading requirement," *id.* at 510, 122 S.Ct. 992, that may require demonstrating more elements than are otherwise required to state a claim for relief, *id.* at 511-12, 122 S.Ct. 992. The Court stated that requiring a plaintiff to plead a prima facie case would amount to a "heightened pleading standard" that would conflict with Federal Rule of Civil Procedure 8(a)(2). *Id.* at 512, 122 S.Ct. 992. As the Court explained:

[I]t is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case. For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case. Direct evidence of discriminatory intent

is evidence that, "if believed, proves the fact [of discriminatory intent] without inference or presumption." Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095 (9th Cir. 2005) (citation omitted).

Occasionally, a recipient official admits to having considered race during the decisional process as a basis for its action. In other instances, a recipient explicitly conditions the receipt of benefits or services on the race, color, or national origin of the beneficiary, or explicitly directs action be taken based on race, color, or national origin. These kinds of requirements are often referred to as "express classifications," and are the clearest form of direct evidence.

Short of an express classification, other direct evidence of discrimination includes "any statement or document which shows on its face that an improper criterion served as the basis … for [an] adverse … action." Fabela v. Socorro Indep. Sch. Dist., 329 F.3d 409, 415 (5th Cir. 2003).

Even without a direct admission or express policy, a plaintiff may prove intentional discrimination with other forms of direct evidence demonstrating that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring); [9] Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997) (direct evidence includes "evidence which in and of itself suggests" that someone with managerial authority was "animated by an illegal ... criterion."). For example, a statement of an official involved in the decision stating that an ostensibly race-neutral action was taken in order to limit minority individuals' eligibility for a federally funded benefit or program is direct evidence of race-based intent. Even isolated comments may constitute direct evidence of discrimination if they are "contemporaneous with the [adverse action] or causally related to the [adverse action] decision making process." Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 723 (7th Cir. 1998) (citations omitted).

This type of direct evidence of discriminatory intent does not require "a virtual admission of illegality." Venters, 123 F.3d at 973. For example, direct evidence need not take the form of an admission where the defendant states "I'm [taking this adverse action] because you're in a protected group." Sheehan v. Donlen Corp., 173 F.3d 1039, 1044 (7th Cir. 1999); see Venters, 123 F.3d at 973. The court in Venters explained that "the evidence need not be this obvious to qualify as direct evidence." Id. And the Sheehan court explained why: because such a requirement "would cripple enforcement of the ... discrimination laws." Sheehan, 173 F.3d at 1044. The direct evidence of such remarks must, however, establish that race was an important factor motivating the challenged action. "Stray remarks," "derogatory comments," even those uttered by decision-makers, may not constitute direct evidence of discrimination if unrelated to the adverse decision. Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring); Fuentes v. Perskie, 32 F.3d 759, 767 (3d Cir. 1994). Evidence of such remarks or comments is nevertheless important in an intent case, and can help to establish circumstantial or indirect evidence of intent. Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 368 (3d Cir. 2008); Fitzgerald v. Action, Inc., 521 F.3d 867, 877 (8th Cir. 2008) (same); see also Lounds v. Lincare, Inc., 812 F.3d 1208, 1224 (10th Cir. 2015) (citing Kerri Lynn Stone, Taking in Strays:

A Critique of the Stray Comment Doctrine in Employment Discrimination Law, 77 Mo. L. Rev. 149, 177 (2012) ("[S]tray remarks can prove to be invaluable insights into biases at every level of consciousness that may be rife but invisible within the workplace.... [They] may bespeak a workplace culture in which certain language or sentiments are tolerated and perhaps encouraged or rewarded.")).

By way of illustration, in Wilson v. Susquehanna Township Police Dep't, 55 F.3d 126 (3d Cir. 1995), a Title VII case, a female plaintiff alleged that she was not promoted because of her sex. The plaintiff's evidence revealed a number of discriminatory occurrences, including the daily circulation of sexually explicit drawings, the posting of obscene notices (some referring to female employees by name), sexual conversations between officers and female employees, the showing of an x-rated movie and graphic home videos in the station house, the Chief's regular discussion of sex lives and employees' anatomy, the Chief's bemused dismissal of the plaintiff's complaint about an indecent assault committed by an officer, and the Chief's comment that he did not promote the plaintiff because the town manager "wanted a man." Id. at 127–29. The court of appeals described that evidence as direct evidence of intentional sex discrimination, explaining that "[t]he record clearly goes beyond 'stray remarks' and evinces strong gender bias in the police department.... This evidence, which included 'conduct or statements by persons involved directly reflecting the discriminatory attitude,' ... constitutes 'direct evidence' of discriminatory animus." Id. at 130 (citations and quotations omitted).

*Id.* at 511, 122 S.Ct. 992. Accordingly, the Court concluded that "the ordinary rules for assessing the sufficiency of a complaint apply," referring to Federal Rule of Civil Procedure 8(a)(2). *Id. McCleary-Evans v. Maryland Dept. of Transp.*, 780 F. 3d 582 (4th Cir. 2015).

## I.        INTRODUCTION

*Pro Se* Plaintiff Jennifer Wilson is filing a complaint alleging that Conduent, Verizon and Bristol-Myers Squibb (BMS) has committed: (1) race discrimination pursuant to Title VII of the civil Rights Act of 1964, 42 §§ U.S.C 2000e, et seq. ("Title VII"); (2) retaliation pursuant to Title VII; (3) racial harassment pursuant to Title VII; wrongful termination in violation of Virginia employment at-will public policy; (5) intentional and/or negligent infliction of emotional distress ("IIED and NIED") and (6) defamation was committed against the plaintiff. The notion that Ms. Wilson's complaint was inconclusive or not valid is simply untrue. The motive is clear and posed a serious risk to Ms. Wilson's rights.

The material adverse employment action that Ms. Wilson speaks of shows that these actions interrupted her learning and her foundation for the job at hand. So, these adverse actions affected her employment. No one can reasonably learn and complete three assessments in one day.

Direct evidence is given to explain her facts. The defendants failed to act reasonably and civilly and kept violating their legal obligations, and in their outright unreasonableness they refused to treat the Plaintiff civilly because of her race. The Plaintiff relied upon civility in the workplace. It

is well established that "[c]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss[.]" Dunn v. Castro, 621 F.3d 1196, 1205 n.6 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)). "The purpose of a 12(b)(6) motion is to test the sufficiency of a Complaint; 'importantly, [a Rule 12(b)(6)] motion does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses.'" Butler v. U.S., 702 F.3d 749, 752 (4th Cir. 2012)(quotation omitted). A complaint may not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Mancinni, Id. (Citations omitted). A complaint "must be liberally construed" and "should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations." Furthermore, "a well pleaded complaint will survive a motion to dismiss 'even if it appears that a recovery is very remote and unlikely.'" Spadaro v. City of Miramar, 855 F.Supp.2d 1317, 1328 (S.D. Fla. 2012), quoting from, Twombly, 550 U.S. at 555-556. To dismiss (a Complaint) because of some initial skepticism would be to mistakenly 'collapse discovery, summary judgment [,] and trial into the pleading stages of a case.'" SD3 LLC v. Black and Decker (U.S.) Inc., – F.3d –, 2015 WL 5334119, *17

A complaint "attacked by a Rule 12(b)(6) motion does not need detailed factual allegations;" however, (F)actual allegations must be enough to raise a right to relief above the speculative level." Id., quoting from, Bell Atlantic Corp. V. Twombly, 550 U.S. 544, 555 (2007). The complaint must be "plausible on its face" and must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Mancinni v. Broward County Sheriff, 2014 WL 7792953, *2 (S.D. Fla., October 21, 2014), citing, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(quotations omitted); Covey v. Assessor of Ohio County, 777 F.3d 186, 192 ; Sinclair, at *3. In re Vitamins Antitrust Litigation, 217 F.R.D. 30, 32 (D.D.C. 2003), The Supreme Court explained that "if the underlying facts or circumstances relied upon by a plaintiff may be a proper source of relief, he ought to be afforded an opportunity to test his claim on the merits." Foman, 371 U.S. at 182. In fact, the underlying reason this complaint should not be dismissed is "because [the] Federal Rules suggest [that the] 'artless drafting of a complaint should not allow for the artful dodging of a claim.'" Driscoll v. George Washington Case 1:13-cv-00037-KBJ Document 23 Filed 07/30/13 Page 3 of 6 4 Univ., No. 12-0690, 2012 U.S. Dist. LEXIS 127870, at *7 (D.D.C. Sept. 10, 2012) (alteration in original) (quoting Poloron Prods., Inc. v. Lybrand Ross Bros. & Montgomery, 72 F.R.D. 556, 561 (S.D.N.Y. 1976)). Indeed, the Plaintiff's complaint is not "a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading. . . ." FED.R.CIV.P. 12(e). The sufficiency of a complaint is a question of law, and when considering and addressing a Rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. Genesee County Employees' Retirement System v. Thornburg Mortgage Securities Trust 2006-3, 825 F. Supp. 2d 1082, 1120-21 (D.N.M. 2011), citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). If the court can reasonably read the submissions, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with rule requirements. Boag v. MacDougall, 454 U.S. 364, 102 S.Ct. 700, 70 L.Ed.2d 551 (1982); Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251

(1976) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); McDowell v. Delaware State Police, 88 F.3d 188, 189 (3rd Cir. 1996); United States v. Day, 969 F.2d 39, 42 (3rd Cir. 1992)(holding pro se petition cannot be held to same standard as pleadings drafted by attorneys); Then v. I.N.S., 58 F.Supp.2d 422, 429 (D.N.J. 1999).

Further, the Plaintiff does allege that she was discharged because of her race. The plaintiff had asked a serious question. Why was she not given the right to go home, when other people, like Nathan Pfleger, had also taken sick time. Whether it was a comparison or not she still did not deserve to be fired for going to Human Resources or to EEOC. The Plaintiff has stated that she complained to Human Resources, and when she did less than two months later, she was fired. The Plaintiff knew she had been treated differently and was suffering from race discrimination. She reported this conduct done by Verizon employees to give notice to Conduent, who just disregarded her claims.

"[I]n the area of tort liability, from whence the dissent's 'but-for' standard of causation is derived, . . . the law has long recognized that in certain 'civil cases' leaving the burden of persuasion on the plaintiff to prove 'but-for' causation would be both unfair and destructive of the deterrent purposes embodied in the concept of duty of care. Thus, in multiple causation cases, where a breach of duty has been established, the common law of torts has long shifted the burden of proof to . . . defendants to prove that their negligent actions were not the 'but-for' cause of the plaintiff's injury." Id., at 263-264, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (concurring in judgment) (citing Summers v. Tice, 33 Cal. 2d 80, 84-87, 199 P. 2d 1, 3-4 (1948)). A court faced with a motion to dismiss a pro se complaint must read the complaint's allegations expansively, Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972), and take them as true for purposes of deciding whether they state a claim. Cruz v. Beto, 405 U.S. 319, 322, 92 S. Ct. 1079, 1081, 31 L. Ed. 2d 263 (1972).

Plaintiffs' retaliation claims are sufficient. A number of factors are adduced to explain the situation. The Plaintiff was subjected to disparate treatment relative to similarly -situated employees and Ms. Wilson had suffered a work environment that could be shown to be objectively hostile. All because she was African-American. When the Defendants had the opportunity to clarify her claims made to human resources, they waived the opportunity by not responding to the Equal Employment Opportunity Commission (EEOC). The Plaintiff filed a charge with human resources and within the same amount of time the Plaintiff experienced horrible treatment, enough to make her want to quit and when she went to Bristol-Myers Squibb, they made it unreasonable. The first day she heard her name called in the classroom a lot, but she figured because there were only 3 people in the Teams group that maybe that can be expected. Then the class was given modules to go over and an assessment was to be taken on that module. The teacher went over the tests and answers were given but they stated that you can only receive a 90 or above. Ms. Wilson did not get a 90 or above on any of the tests and neither did one other, Megan. From this case Ms. Wilson can find out if Meghan or anyone else in her class received more than one failing grade which will prove another discrimination. When Ms. Wilson had received a 78, the class trainer pulled both Ms. Wilson and Megan in a side huddle to go over the answers they got wrong. Ms. Wilson had made under 80 twice and Bristol-Myers Squibb put her on suspension and Tuesday of the next week she was fired. Ms. Wilson believes that she failed

those tests through no fault of her own. She, like at least one other in the classroom was having a problem with the tests because of the magnitude of information she had to absorb. The last day that she worked for BMS, she had to complete three assessments and that is from the two assessments she had the day prior. I let them  know that having to complete so many assessments was the problem and they still fired me. I cudnt go to Human Resources because I was fired. On the phone call, Ms. Wilson let her (Phinizy) know that this immediate firing was not in the handbook and therefore there is process to firing. I respect the process. As stated above "reasonable notice" has to be given by both the plaintiff and the defendant. Reasonable notice was not given by BMS and Ms. Wilson believes that they just wanted to fire her for the complaint she had given about her managers at Verizon. So even if it was not in the original paperwork to which she was hired, something happened between manager to manager-that made them want to fire her immediately without reasonable notice. So this was wrongful termination and retaliatory.

Although a plaintiff's testimony may establish retaliation, such testimony is only sufficient if it "proves the fact of intentional retaliation without inference or presumption." Fierros v. Texas Dept. of Health, 274 F.3d 187, 195 (5th Cir.2001) (citation omitted).

Because direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of a chronology of events from which retaliation can be inferred is sufficient to survive dismissal. See Pratt, 65 F.3d at 808 ("timing can properly be considered as circumstantial evidence of retaliatory intent"); Murphy v. Lane, 833 F.2d 106, 108–09 (7th Cir.1987).

Retaliation claims under Title VII are evaluated under a three-step burden shifting analysis." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish a prima facie case of retaliation by showing: "`(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Jute, 420 F.3d at 173 (quoting McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001)).  The Plaintiff has proven all steps. The Plaintiff did engage in statutorily protected conduct because she contacted HUMAN RESOURCES. Because HUMAN RESOURCES is a specific department reserved for adverse employment, these actions happened because it was influenced by the protected activity. There was not a lengthy time gap, but the adversity was nearly consecutive. So, the claim based on this protected activity is legally sufficient and factually substantiated.

Next, BMS violated public policy in terminating Ms. Wilsons employment, which was wrongful termination,  which is in violation of the Federal statutes and violates Virginia public policy. They fired her because she engaged in a protected activity trying to protect her right as an African-American to state that she was being unjustly treated. "Public policy can no more be accurately defined than can due process of law. As Sir James Burroughs wisely observed it is `a very unruly horse.'" Old Dom. Transp. Co. v. Hamilton, 146 Va. 594, 608, 131 S.E. 850, 855 (1926). As the then Virginia Supreme Court of Appeals observed: "The very reverse of that which is public policy at one time may become public policy at another time. Hence, no fixed rule can be given by which to determine what is public policy." Wallihan v. Hughes, 196 Va.

117, 124-25, 82 S.E.2d 553, 558 (1954) (citing 12 Am.Jur. Contracts § 169, p. 666). The public policy exception to the at-will employment rule reveals that the plaintiffs in those cases all sought redress because they were fired for engaging in what they believed to be protected activity. See, e.g. Harris, 259 Va. at 226, 523 S.E.2d at 241.

The Bowman court limited this exception to wrongful discharge claims brought pursuant to public policies underlying existing laws "designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." Miller v. SEVAMP, Inc., 362 S.E.2d 915, 918 (Va. 1987); see also White v. Fed. Exp. Corp., 729 F. Supp. 1536, 1549-50 (E.D. Va. 1990) (holding that absent the application of a statutory exception to the at-will doctrine, under Virginia law employees may be discharged for any reason, or indeed for no reason, unless the discharge violates Virginia public policy). Virginia strongly adheres to the employment-at-will doctrine, but with certain narrow exceptions to "temper its harsh application". Bowman v. State Bank of Keysville, 229 Va. 534, 540 (1985); see also Lockhart v. Commonwealth Educ. Sys. Corp., 247 Va. 98, 102 (1994); Miller v. SEVAMP, Inc., 234 Va. 462, 468 (1987). An employee has a cause of action in tort when her discharge is the result of employer conduct that violates Virginia public policy. Bowman, 229 Va. at 540. A statute may either explicitly state, or embody as a necessary corollary, a public policy goal. Mitchem v. Counts, 259 Va. 179, 189 (2000).

The elements of intentional infliction of emotional distress in Virginia are: "[1] the wrongdoer's conduct is intentional or reckless; [2] the conduct is outrageous and intolerable; [3] the alleged wrongful conduct and emotional distress are causally connected; and, [4] the distress is severe." Russo v. White, 241 Va. 23, 26, 400 S.E.2d 160, 162 (1991). Defendants challenge the second and element for intentional infliction of emotional distress, expert testimony is not required to establish the existence of a serious mental injury. 8 S.W.3d at 612, 616.Miller clarified that the analysis of the "serious mental injury" requirement is the same for both intentional infliction of emotional distress claims and negligent infliction of emotional distress claims. We observed that "[t]he flagrant and outrageous nature of the defendant's conduct ... adds weight to a plaintiff's claim and affords more assurance that the claim is serious." Id. at 613 (citing Brower v. Ackerley, 88 Wash. App. 87, 943 P.2d 1141, 1149 (1997); Tanner v. Rite Aid of W. Va., Inc., 194 W.Va. 643, 461 S.E.2d 149, 161 (1995)). The "extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.

The plaintiff continues to state that she has experienced great harm in dealing with this company. The mental anguish of nagging and confusion is outrageous. No one else in her classroom had to experience this, so why should Ms. Wilson have to experience this.

The plaintiff has standing to bring her claim because Verizon threatens an immediate and irreparable denial of the plaintiffs' constitutional rights. It is well established that "[c]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling." Dunn v. Castro, 621 F.3d 1196, 1205 n.6 (quoting Tellabs, Inc. v. Makor Issues &

Rights, Ltd., 551 U.S. 308, 322 (2007)) . Because the plaintiff is preceding pro se, her complaint should be construed liberally. See Hartmann v. Carroll, 492 F.3d 478, 482 n.8 (3d Cir. 2007).

The plaintiffs' responsibility is to prove that this company has done a copious amount of discriminatory acts and therefore asks that her complaint not be dismissed so that this complaint can move to Discovery in order to clarify all claims. Plaintiff must be permitted to go forward with discovery and to trial so the merits of this case can be argued. The plaintiff will prove that her request is not futile and that her request does not rely "only to actions or inaction's of federal, state, and local governments." (citing Gantt v. Sec., USA, Inc., 356 F.3d 547, 552 (4th Cir. 2004)).

The fourteenth amendment states that, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Although a court proceeding is not a requisite of Due Process, it does satisfy the Due Process clause. The core of these requirements is notice and a hearing before an impartial tribunal. Due process may also require an opportunity for confrontation and cross-examination, and for discovery; that a decision be made based on the record. In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.

Article 1 Section 3 of the Bill of Rights in the Constitution of Virginia states that the government instituted for common benefit. "That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community; of all the various modes and forms of government, that is best which is capable of producing the greatest degree of happiness and safety, and is most effectually secured against the danger of maladministration; and, whenever any government shall be found inadequate or contrary to these purposes, a majority of the community hath an indubitable, inalienable, and indefeasible right to reform, alter, or abolish it, in such manner as shall be judged most conducive to the public weal."

Although the defendant is not a "government actor" by trade, the defendant did not heed to the administrative process that is in place to prevent lawsuits. This may have been their intention, to forgo administration, but in doing this they made themselves a "government actor" and therefore should qualify them as "an exception to the state action requirement". (citing Gantt v. Sec., USA, Inc., 356 F.3d 547, 552 (4th Cir. 2004))

But as an employer, Verizon may be able to make decisions independently of the government. But they cannot break the law, which is what they have done. There is only one U.S. Constitution and only one Constitution of Virginia, both of which cannot define an employer as a government actor.

The constitutional issue before this court is that Verizon and BMS violated Title VII of the Civil Rights Act of 1964, among other claims. The Plaintiffs' basis has always been about the laws established for employment since 1964 and has never been about the "actions or inaction's of

federal State, and local governments" and therefore no judgment should be based on the Gantt v. Sec. case citation.

(citing Gantt v. Sec., USA, Inc., 356 F.3d 547, 552 (4th Cir. 2004)).

Proving that the defendant acted as a government actor, in order to state this constitutional claim, is not hard. The plaintiff can, indeed, prove Conduent, Verizon an Bristol-Meyers Squibb to be a government actor in this case simply because they acted in self-governance. Self-governance falls within the larger context of governance and principles that involves corporate governance. They were able to exercise all of the necessary functions of power without intervention from any authority that they cannot themselves alter. They enjoyed this sovereign right. They perceived themselves as being unrepresented or underrepresented in a national government. It is therefore a branch of self-rule ideology.

Self-governance is comprised of an ethical code. The ethical code outlines acceptable behavior within a unit or group or established codes of professional ethics.

Self-governance is also comprised of some set of criteria whereby an outside legal code or political authority can be called in- unless the group itself opposes such authority. For example, organized crime groups which are self-governing almost by definition.

Self-governance is also a means ensuring that outside authority does not become involved unless and until these criteria are satisfied, in essence a code of silence by Verizon. This self-governance became evident when Verizon refused mediation with the EEOC. They refused to resolve grievances within and outside of the company.

Self-governance also gives the power to discipline its own members, which they did not do with any complaint brought before Verizon. In essence, they sought to control all parties that would compete with the group or organization that already exists.

Article 1 section 1 of the Virginia Constitution Bill of Rights, states "That all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety."

The problem is Conduent, Verizon and BMS misused this position of self-governance, which is why no company can act as its own authority. They gave the appearance of a government actor and even giving the appearance makes them a government actor. Verizon should have recognized its responsibility to protect and conserve the constitution, government property and resources, and to make an honest effort to use official time and government property only for official business. Rules are established by the Virginia Constitution for a reason and Verizon violated government authority.

The Equal Protection Clause of the Fourteenth Amendment of the Constitution prohibits states from denying any person within its territory the equal protection of the laws. This means that a

state must treat an individual in the same manner as others in similar conditions and circumstances. The Federal Government must do the same, but this is required by the Fifth Amendment Due Process. They clearly violated the Constitution, and this lawsuit is the Plaintiffs' only sense of recourse.

Plaintiff, Jennifer Wilson, submits her Complaint. This complaint includes Racial discrimination, Workplace harassment, Retaliation and Intentional Infliction of Emotional Distress and defamation.

On May 9, 2022, Ms. Wilson started training for Verizon. Ms. Wilson completed her training and went onto the center floor. There on the center floor, Ms. Wilson proceeded to do her job for the company. Having previously not taken time off from her last assignment, which was a Work from Home job, MS. Wilson wanted to regroup and stay healthy. Ms. Wilson took July 6-11th off, then took July 13th-19th off. Ms. Wilson did not see a problem with this as she has the time available in her time off chart in her portal. When MS. Wilson got back, she received a one on one with Alex, in which he told her that she would be written up for the time that she had taken off. She signed the paperwork even though she thought that it wasn't right that she was not given a warning for her time off. Every business has a process and the policy for attendance was not followed. Because it was sick time, you don't have to request the time off in advance-that's vacation time.

Also, when we signed onto be with Verizon, we were told that we can work to get home, meaning that we work for the opportunity to work at home. Ms. Wilson was discriminated in this as well. Ms. Wilsons' teammates all went home, and she was left stuck at the center. Including Nathan Pfleger, who is white, who used up all of his sick time and went home early a few times too. He was able to go home with no incident, but Ms. Wilson who started at the same time with Mr. Pfleger and had the same job description, was not able to go home.

## II. THE COMPLAINT

On May 9, 2022, Ms. Wilson was hired by Verizon and then on November 9, 2022 Ms. Wilson was hired again by the same company, so this was an internal transfer to Bristol-Myers Squibb (Exhibit A). Everything was going great. She loved her job, which is why she decided to fight for her job when Conduent started to write her up because she took sick time for having back problems (Exhibit B). Ms. Wilson started to have back problems and because she had accrued sick time she decided to use it. Ms. Wilson had banked close to 50 hours sick time for the time she has been with the company. She had also worked for Fiserv for some time, but they are not apart of this complaint. She is just acknowledging that she has been with the company for a while and that is the reason she had so much sick time. Ms. Wilson has not taken a sick day yet and decided to use them. She did not plan on using them consecutively but she did. It was her right to use her sick time consecutively or not. Day after day she called in and did the proper procedure for a call out. During that time, she had a doctor's appointment and a follow up

(Exhibit B). She went to her doctor's appointment and had her x-rays and etc. during that time. When Ms. Wilson got back, she received a verbal (A verbal discipline) for using her sick time. This did not seem right to her but she didn't argue the point. Her manager, Alex Rodriguez (Alex) told her that next time all she had to do was put in for the time she will be out, even though no one knows when they will be sick. But she put in for the time she would be out because she had a follow up (exhibit B). And Mr. Alex granted her request in the audit report. When she got back from her follow up, the next day when Ms. Wilson came to work she received a written. "Hold on" Ms. Wilson thought, "the next step is recommending for termination." Ms. Wilson got with her teammates that were in the training class with her and Nathan Pfleger stated that he received no disciplinary action because he had some excuse. But Ms. Wilson used her sick time like the state of Virginia allows in the code of Virginia:

Article 2.1. Paid Sick Leave.
§ 40.1-33.6. Retaliatory action prohibited.

No employer shall discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee (i) has requested or exercised the benefits provided for in this article or (ii) has alleged a violation of this article.

Also, their own attendance policy states "where both not complying, and the absence not being protected" have to both be true in order to consider an absence being unexcused. This means that two things have to be true in order for an unexcused absence to occur: 1. You have to not comply (meaning you did not call in and say that you will be absent), as Ms. Wilson has already stated she called in each time and let the system know that she would be absent. And 2. The absence has to not be protected (meaning that it has to be an excuse that is not protected. Ms. Wilson took July 6-11th off, then took July 13th-19th off. As Ms. Wilson stated she took her accrued sick time. Her sick time was protected under the company policy and the state of Virginia. So, Ms. Wilson should not have even been written up or given a verbal. But she was, by Mr. Alex. When MS. Wilson got back, she received a one on one with Alex, in which he told her that she would be written up for the time that she had taken off. She signed the paperwork even though she thought that it wasn't right that she was not given a warning for her time off. Every business has a process and the policy for attendance was not followed. Because it was sick time, you don't have to request the time off in advance. Requesting time off in advance is vacation time.

Also, when she signed onto be with Verizon, the class was told that we can work to get home, meaning that we work for the opportunity to work at home. Ms. Wilson was discriminated in this as well. Ms. Wilsons' teammates all went home, and she was left stuck at the center. Including Nathan Pfleger, who is white, who used up all of his sick time and went home early a few times too. He was able to go home with no incident, but Ms. Wilson who started at the same time with Mr. Pfleger and had the same job description, was not able to go home.

Nathan Pfleger did not receive any disciplinary action and when it was time to send people home for work at home, Ms. Wilson was left in the center. Ms. Wilson asked Mrs. Beverly Arbor (Mrs. Beverly) why, and she stated that it was because she took her sick time. It was a back and forth with Mrs. Beverly until a whole month passed. This was more time than when she took off so it

couldn't have been the fact that she took sick time. (Exhibit C). Nathan Pfleger is a white employee and Ms. Wilson is an African American employee. They both started at the same time, May 9. They both used their sick time with respective excuses, so what would be the reason why Ms. Wilson was the only person punished. So, both Mrs. Beverly and Mr. Alex could not state the reason why she was disciplined and not Nathan Pfleger and why Nathan Pfleger was able to go home and she was not. Ms. Wilson was aware Nathan took time off because she was there when he wasn't there for days at a time. So, Ms. Wilson Spoke with Mrs. Beverly (Exhibit C), went to human resources where she got in touch with Steven Frey, Human Resources leader Exhibit F), where a team's meeting was set up that turned into a phone call. Ms. Wilson advised him of the whole ordeal and sent emails back and forth with him as well. So clearly, Verizon violated workplace protections. There were retaliatory actions that took place, like giving her extra calls (Exhibit D), almost double what everyone else was getting. Then Ms. Wilson waited the time in which it took to leave this department and transfer to another department, which is 6 months, and she transferred within the company to Bristol-Myers Squibb. She was hired, great. Then she received a notification from her current manager, Doreen Singer, that Beverly Arbor told her that I did not tell them I was transferring (Exhibit E). This is true, but only because my recruiter was supposed to advise them of the transfer. In fact, she was supposed to get a signature from both of my managers and a signature from Human resources (Exhibit E). This was done, as my recruiter later advised me, that this is done before I am given the offer letter. As you can see from the exhibit a carbon copy (cc) was with Christine Francis. Christine Francis, Operations Manager, signed off on the transfer. Then, I was told that I would have to pass every test with a 90 or I could be terminated. We went over the tests and did a review before the tests, but because it was so much information and that last day we had to take three assessments, Ms. Wilson ended up receiving two 78'on the tests. Ms. Wilson was not the only one. A girl named Meghan, a Caucasian female, also received a score below 80 and was in the second review with Ms. Wilson. After the second review for both tests, Ms. Wilson received above 90. But, C. Phinizy, who was Doreen's boss, put me on suspension (Exhibit G). Then about a week later she terminated me. Ms. Wilson believes that the termination came from Defamation. Defamation is the act of communicating to a third-party false statement about a person, place or thing that results in damage to its reputation. It can be spoken or written. She had knowledge that the two managers spoke because of the email stating that Mrs. Beverly told her that I had not told them that I was transferring (Exhibit E). Defamation is the action of damaging the good reputation of someone; slander or libel. Defamation is a tort that encompasses false statements of fact that harm another's reputation. They tried and did hurt Ms. Wilson's good name. There is malice in what they did to get Ms. Wilson fired. So, because of this Bristol-Myers Squibb is guilty by association and that is why Ms. Wilson is suing them too. Ms. Wilson believes whatever was said by the upper principles, injured her reputation and therefore they put this false test score and goal to get Ms. Wilson fired. They did not give Ms. Wilson reasonable accommodation. As stated above, there is a policy before someone gets fired and because such a policy exists it would make the Virginia at-will policy null. Ms. Wilson was not given a formal verbal or a written and was not officially written up for anything with Bristol-Myers Squibb. Ms. Wilson was just immediately fired, and there is nothing in their handbook that gives them the right to immediately fire an employee. As stated above, the firing was due to racial discrimination and therefore is wrongful termination.

### III.   LEGAL STANDARD

Rule 8 requires that a Complaint include: (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

In *Conley v. Gibson*, the Supreme Court stated unless there were "no set of facts" that could emerge that would enable the plaintiff to win his case, then the Complaint should not be dismissed.

This standard required very little detail whatsoever.  In two more recent cases, *Bell Atlantic v. Twombly* and *Ashcroft v. Iqbal*  the Supreme Court stated that a Complaint must have enough detail showing that it is at least plausible that the plaintiff is entitled to relief.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and this Court has original jurisdiction overall claims including racial discrimination, retaliation and racial harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C 2000e. The Court also has jurisdiction over Ms. Wilson's wrongful termination claim because Conduent, Verizon and BMS violated public policy to support a common law wrongful termination claim. Also, the Plaintiff does allege extreme and outrageous conduct to set forth a claim for intentional infliction of emotional distress and Ms. Wilson also alleges negligent conduct to set forth a claim for negligent infliction of emotional distress. Ms. Wilson is a long-term resident of  the Eastern District of Virginia  and Ms. Wilson seeks 20 million dollars.

In deciding a motion to dismiss under Rule 12 (b) (6), a court must "constru[e] the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)). Furthermore, "[t]he Supreme Court has long held that courts must construe pro se complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." Elliott v. Bronson, 872 F.2d 20, 21 (2d Cir. 1989) (per curiam) (citing Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (per curiam); Hughes v. Rowe, 449 U.S. 5, 9, 101 S. Ct. 173, 175 (1980); and Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 595 (1972) (per curiam)); see also Ferran v. Town of Nassau, 11 F.3d 21, 22 (2d Cir. 1993). "[C]ourts must construe pro se pleadings broadly, and interpret them `to raise the strongest arguments that they suggest.'" Cruz v. Gomez, 202 F.3d 593, 597 (2d  Cir. 2000) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)). "This is especially true when dealing with pro se complaints alleging civil rights violations." Weixel v. Bd. of Educ. Of N.Y., 287 F.3d 138, 146 (2d Cir. 2002) (citingWeinstein v. Albright, 261 F.3d 127, 132 (2d Cir. 2001)).

On a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quotingScheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974)). Dismissal is warranted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46, 78 S. Ct. at 102; accord Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000); Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994).

The Supreme Court has clarified the standard for dismissal of employment discrimination claims. It held in Swierkiewicz that a plaintiff bringing an employment discrimination claim is required only to comply with the liberal rules for notice pleading set forth in Rule 8 (a) (2) of the Federal Rules of Civil Procedure. See Swierkiewicz, 534 U.S. at 508, 122 S. Ct. at 995. "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination. . . ." Id. at 515, 122 S. Ct. at 999; accord Twombly v. Bell Atlantic Corp., 425 F.3d 99, 107-08 (2d Cir. 2005); Phillip v. Univ. of Rochester, 316 F.3d 291, 298 (2d Cir. 2003); Galvez v. New York Mortg. Co., LLC, No. 05 Civ. 2365 (DLC), 2005 WL 2124112, at *2 (S.D.N.Y. Sept. 1, 2005). As the Supreme Court observed, to hold otherwise not only would "narrowly constrict the role of the pleadings," but also would be inappropriate in certain cases, such as where a plaintiff, following discovery, may "produce direct evidence of discrimination." Swierkiewicz, 534 U.S. at 511, 122 S. Ct. at 997 (internal citation and quotation marks omitted).

## IV.      ARGUMENT

### A.  Plaintiff States a Plausible Title VII Race Discrimination Claim

It is important to prove discrimination under Title VII of The Civil Rights Act of 1964. Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII), as amended, as it appears in volume 42 of the United States Code, beginning at section 2000e. Title VII prohibits employment discrimination based on race, color, religion, sex and national origin. The Civil Rights Act of 1991 (Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111-2) amend several sections of Title VII. In addition, section 102 of the CRA amends the Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII. This act was made to establish a Commission on Equal Employment Opportunity, and also for other purposes. Verizon is subject to Title VII because they are an employer. Racial discrimination, which was done by Verizon to the Plaintiff, is illegal and therefore the Plaintiffs' complaint is actionable. Ms. Wilson provided direct evidence and therefore her allegations were not absent direct evidence.  Direct evidence is presented by a showing that respondent failed to take appropriate corrective action in situations in which it knew or reasonably should have known that practices and policies or the behavior of its employees were discriminatory. The Plaintiff believes all exhibits should be considered based on, "The overwhelming weight of authority is that the failure to file documents in an original motion or opposition does not turn the late filed documents into "newly discovered evidence." See Waltman v. International Paper Co., 875 F.2d 468, 473-74 (5th Cir. 1989).  Plus, In Swierkiewicz, the Supreme Court held that "an

employment discrimination plaintiff need not plead a prima facie case of discrimination ... to survive [a] motion to dismiss," 534 U.S. at 515, 122 S.Ct. 992, because "[t]he prima facie case ... is an evidentiary standard, not a pleading requirement," *id.* at 510, 122 S.Ct. 992, that may require demonstrating more elements than are otherwise required to state a claim for relief, *id.* at 511-12, 122 S.Ct. 992. The Court stated that requiring a plaintiff to plead a prima facie case would amount to a "heightened pleading standard" that would conflict with Federal Rule of Civil Procedure 8(a)(2). *Id.* at 512, 122 S.Ct. 992. As the Court explained:

[I]t is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case. For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case.

But, the Plaintiff will prove this framework anyway because it is a common way to prove intentional discrimination is to establish that a recipient treated similarly situated individuals differently because of race, color, or national origin.

Plaintiff will first prove a prima facie case of discrimination by a preponderance of the evidence. To establish a prima facie case of intentional discrimination using the McDonnell-Douglas framework from Title VII, a plaintiff typically shows that he or she is a member of a particular protected group, was eligible for the recipient's program, activity or service, and was not accepted into that program or otherwise treated in an adverse manner, and that an individual who was similarly situated with respect to qualifications, but was not in the plaintiff's protected group was given better treatment. See, e.g., Brewer v. Bd. of Trs. of Univ. of Ill., 479 F.3d 908, 921 (7th Cir. 2007). The Plaintiff has proven this. With respect to harm, the harm need not be physical in nature, or even the type of harm that would permit an award of compensatory damages. For example, the Supreme Court has held that intentional racial segregation is a harm in and of itself. See Brown v. Bd. of Educ., 347 U.S. 483 (1954). Similarly, the stigma that intentional discrimination may cause is a cognizable harm. See generally Johnson v. California, 543 U.S. 499, 507 (2005) ("racial classifications 'threaten to stigmatize individuals by reason of their membership in a racial group'") (quoting Shaw v. Reno, 509 U.S. 630, 643 (1993)). The provision of fewer or inferior services or benefits to a person or class of persons will satisfy the adversity requirement, but adversity can be established even without the loss of specific services or benefits; threatened or imminent harm can satisfy the adverse action requirement. Verizon may not administer their programs or activities in a manner that "den[ies] any individual any disposition, service, financial aid, or benefit provided under the program," 28 C.F.R. § 42.104(b)(1)(i) (DOJ) (emphasis added), or "restrict[s] an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program," Id. § 42.104(b)(1)(iv) (emphasis added). Which they have done.

Next, if the plaintiff establishes a prima facie case, the burden in court shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. EEOC v. Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009). The defendant's explanation of its legitimate reasons must be clear and reasonably specific; not all proffered reasons would be

legally sufficient to rebut a prima facie case. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254–55, 258 (1981). For example, in the employment context, a defendant may not merely state that the employment decision was based on the hiring of the "best qualified" applicant, but must provide specifics regarding that applicant's qualifications, such as seniority, length of service in the same position, personal characteristics, general education, or experience in comparable work, and must demonstrate why that person's qualifications were considered superior to those of the plaintiff. See Steger v. Gen. Elec. Co., 318 F.3d 1066, 1075–76 (11th Cir. 2003). Which the Plaintiff has done.

Next, if the defendant meets the Step 2 burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is false—that is, that the nondiscriminatory reason(s) the defendant gives for its actions are not the true reasons and are actually a pretext for the exercise of prohibited discriminatory intent. Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1162– 63 (11th Cir. 2006) (addressing a Title VII race discrimination claim). A plaintiff can show pretext by pointing to "weaknesses, implausibility's, inconsistencies, incoherencies, or contradictions" in the defendant's proffered legitimate reasons for its action, such that a reasonable fact finder could rationally find them unworthy of credence. Id. at 1163 (quoting Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005)); Mickelson v. N.Y. Life Ins. Co., 460 F.3d 1304, 1315 (10th Cir. 2006). Plaintiffs can, for example, present evidence that the defendant's stated reasons for taking the adverse action were false; the defendant acted contrary to a written policy setting forth the action the defendant should have taken under the circumstances; or the defendant acted contrary to an unwritten policy or practice when making the decision. See Plotke v. White, 405 F.3d 1092, 1102 (10th Cir. 2005). A plaintiff may also show pretext through evidence that the "employer's proffered non-discriminatory reasons [were] either a post hoc fabrication or otherwise did not actually motivate the employment action …." Fuentes, 32 F.3d at 764. Which the Plaintiff has done. The Supreme Court has cautioned that the four McDonnell-Douglas elements are not "an inflexible formulation." The Plaintiff has shown that what was done to her was not a permissible use of race.

 Accordingly, the Court concluded that "the ordinary rules for assessing the sufficiency of a complaint apply," referring to Federal Rule of Civil Procedure 8(a)(2). Id. McCleary-Evans v. Maryland Dept. of Transp., 780 F. 3d 582 (4th Cir. 2015).

On Count One, using the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), (1) the Plaintiff belongs to a protected group because she is indeed African-American; (2) She suffered adverse actions like suffering workplace harassment and ultimately fired; (3) She was meeting Verizon and BMS legitimate expectations at the time of the adverse employment action; (4) similarly situated employees outside of her protected class were treated more favorably under the same circumstances, the Plaintiff has stated that, Nathan Pfleger, a Caucasian male, was whom she was treated differently from. This harassment showed up in her daily work environment (Exhibit D).

The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5 *[United States Code]*). The Plaintiff asserts claims for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17 (2012), 42 U.S.C. § 1981 (2012). In the present case, there is a genuine issue of material fact and specifically: Plaintiff will plead the necessary elements under Title VII. The Plaintiff will show that the challenged practice has a disparate impact on a member of a protected group. The plaintiff will make out a prima facie case of discrimination under the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  And the claimant will also argue that Verizon "did not treat race neutrally when making its decision[s]." Goode, 2014 WL 3945870, at *6 (alteration in original) (quoting Causey v. Balog, 162 F.3d 795, 802 (4th Cir.1998)). The Plaintiff has maintained that there was at least one non-African-American an employee (Nathan Pfleger, a Caucasian-American) that received proper treatment and it became known to the plaintiff that she was being unjustly treated because of her race. In no way is Ms. Wilson just **saying** there was discrimination she is **proving** that there was discrimination. She is showing that there was an independent factor that can be pointed to in order to prove that her race was a consideration in her employers' decision to discriminate and ultimately discharge Ms. Wilson of her duties. The plaintiff discovered this before she filed an EEOC case and was one of the reasons she filed with the EEOC. And because of these laws, this disparate impact is actionable because this treatment had the effect of excluding a person
who is a member of Title VII's protected classes. The deliberate exploitation of a community on the basis of race constitutes unlawful discrimination. *See Clark v. Universal Builders, Inc., 501 F.2d 324, 330 (7th Cir. 1974).* As in her complaint, the Plaintiff alleges in detail how and why Verizon intentionally targeted the Plaintiff, who is African-American and this lawsuit focuses on how an African-American and a white employee were treated. All exhibits are either time stamped or dated. If it is not time stamped, then it would be dated.

The Plaintiff is (1) A member of a protected class: the Plaintiff is an African-American. (2) The Plaintiffs' job performance was satisfactory and the Plaintiff was fired anyway for no reason set forth under Conduents legitimate expectations. (3) The Plaintiff received and adverse employment action. She was fired. The employer subjected her to workplace harassment and retaliation and ultimately fired her. The Plaintiff faced systemic racism when she complained about the horrible treatment she was receiving and was ignored. Verizon would not make the same employment decision without a discriminatory animus present. If Ms. Wilson had not first spoke up, complained and subsequently filed a complaint of what she believed to be racial acts through HUMAN RESOURCES, then Ms. Wilson would have never been fired. HUMAN RESOURCES is a place that employees can go when they are being discriminated against. Contacting HUMAN RESOURCES would advise anyone reading her complaint that there is an element of discrimination already assumed. So, contacting HUMAN RESOURCES would automatically be a protected activity because Verizon set up that department to consider illegal conduct that the company has done. So, I took my complaint to HUMAN RESOURCES to receive a third-party resolution or explanation because Mrs. Beverly Arbor was not explaining to

her what was happening. If the defendants would have answered the Plaintiffs complaint truthfully of "Why she is being treated differently than at least one other person in the classroom," then she believes that she would not have had to go to HUMAN RESOURCES and further engage in the necessary protected activity. But because she feels that Mrs. Beverly Arbor did not take her questions seriously and saw the obvious dissatisfactions, she had no choice but to complain to HUMAN RESOURCES. After her complaints were ignored and she was fired less than two months after complaining, then she had to bring this lawsuit. **10.3 CIVIL RIGHTS—TITLE VII—DISPARATE TREATMENT—"MOTIVATING FACTOR"— ELEMENTS AND BURDEN OF PROOF**

As to the plaintiff's claim her race was a motivating factor for the defendant's decision to discharge her, the plaintiff has the burden of proving both of the following elements by a preponderance of the evidence:

1. the plaintiff was discharged by the defendant, which is the adverse employment action; and

2. the plaintiff's race was a motivating factor in the defendant's decision to discharge the plaintiff because she complained about being <u>racially</u> mistreated.

In retaliation claims, however, the correct standard in determining causation is the "but-for" standard and not the "motivating factor" standard. *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517 (2013). (4) Other similarly situated employees outside of the protected class were treated differently, like Nathan who is Caucasian. The Plaintiff stated that there was one person outside of her protected class that was treated differently, a White male, his name was Nathan, who was treated more favorably than Ms. Wilson. How he was treated more differently than Ms. Wilson is when Alex Rodriguez told her she was being given a verbal and written up for sick time. Nathan is someone who is in the same position, rank, and job duties, and who is of a different race and was treated more favorable under the same circumstances. He worked under the same rules and regulations that Ms. Wilson did and the fact that the rule had been happily and excusably slanted and he was not reprimanded is inexcusable. There was no reason other than race that might have caused the employer to treat this person more favorably. I later complained to HUMAN RESOURCES. I wouldn't know anything else to set me and Nathan apart other than race. I considered that this treatment could have been a one-off action and even though it could have been unintentional it was still unlawful and according to The Equality Act 2010 says you must not be discriminated against because of your race and it doesn't have to be intentional or unlawful. And still other discriminatory acts followed. But then the Plaintiff considered that maybe the rules were altered or changed because of her race. If not because of her race, then what caused that event of unfair treatment to take place? Moreover, the Supreme Court held in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), that the *McDonnell Douglas prima facie* elements need not be pled in a complaint. Among other reasons, the Court explained that "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a [*McDonnell Douglas*] prima facie case." Plaintiffs' allegations of discriminatory targeting are more than sufficient under Rule 8.

Verizon   must demonstrate that the challenged practice is justified by "business necessity" or tha t the practice is "manifestly related" to job duties. But, because VERIZON ignores the enormous

amount of specific factual allegations supporting Plaintiffs' claims of intentional discrimination, cases on which VERIZON relies heavily are irrelevant.

Even if the Court were to dismiss all of Plaintiffs' federal claims, which it should not, it would still retain broad discretion to exercise jurisdiction over the state law claims under the federal supplemental jurisdiction statute, 28 U.S.C. § 1367. The Fourth Circuit recently reaffirmed the vitality of "the long-standing principle that . . . 'when a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction . . . over pendent state-law claims.'" *Crosby v. City of Gastonia*, 635

F.3d 634, 644 (4th Cir. 2011) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006))

(ellipsis in original). The grant of discretion is broad:

Recent case law has emphasized that trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished. Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy. The doctrine of supplemental jurisdiction thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values. *Shanaghan v. Cahill*, 58 F.3d at 110 (citations and internal quotation marks omitted).

The Court should exercise supplemental jurisdiction here based especially on fairness, an important underlying issue of federal concern, and judicial economy.

Declining to exercise supplemental jurisdiction would allow VERIZON to benefit from gaming the system with respect to the statute of limitations, and would therefore be fundamentally unfair. At least as to some of Plaintiffs' claims, if federal jurisdiction is challenged, the Plaintiff will submit that such a defense will properly be precluded under the continuing violations doctrine. *See, e.g.*, *Havens*, 455 U.S. at 380-81(1982). There are, accordingly, substantial reasons for the Court to retain jurisdiction, as it may under 28 U.S.C. § 1367, even if it were to find that Plaintiffs have not stated a federal claim. The issues that underlie all of Plaintiffs' claims here are also of great federal importance. What VERIZON did was illegal. This case is about an intentional scheme to violate federal law. Federal interests are clearly implicated.

Judicial economy also counsels that the court use its broad discretion to exercise supplemental jurisdiction. Because the class action device is generally unavailable in Virginia state courts, the case would likely otherwise need to proceed on behalf of named individual only. There are, accordingly, substantial reasons for the court to retain jurisdiction, as it may under 28 U.S.C. § 1367, even if it were to find that the Plaintiff has not stated a federal claim.

The Plaintiff can establish a prima facie case because (1) VERIZON took extreme action in regards to her call taking. It was as if that one mishap gave them permission to castigate Ms. Wilson to the point of harassment. So, (2) similarly situated, non-African American employees were treated more favorably than the Plaintiff.

The workplace injustice became illegal when the Plaintiff realized that no other employee, including Nathan, was experiencing what the Plaintiff was experiencing. It was discriminatory. It also became harassing. An adverse employment action is a discriminatory act that "adversely affect 'the terms, conditions or benefits of the plaintiff's employment.'" *Von Gunten v. Maryland*, 243 Cir. 1997))F.3d 858, 865 (4th Cir. 2001) quoting *Munday v. Waste Mgmt. of North AmHuman Resourcesa, INC.*, 126 F.3d 239,243 (4th Cir. 1997)).

Why was this happening, and why was it only happening to her, the plaintiff concluded that it was her race that made the supervisors want to deny her and discharge her from Conduent. Ms. Wilson filed a charge with HUMAN RESOURCES. They apparently thought it was ok to racially discriminate so much so that Ms. Wilson would have believed it was the Conduent policy to choose who they want to and just harp on them. When she did complain to HUMAN RESOURCES, soon after she was fired. A termination decision is motivated by racial discrimination when the individual(s) with decision-making authority act with racial animus. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 291 (4th Cir. 2004) (en banc). During Discovery it will be found out who else had the authority and signed off on the firing of Ms. Wilson.

**B.    Plaintiff States a Plausible Title VII Retaliation Claim**

In Count Two Plaintiff states that retaliation took place after she filed complaints with HUMAN RESOURCES. The adverse action that took place was Ms. Wilson was fired. Establishing a prima facie case under Title VII, plaintiff (1) engaged in statutorily protected conduct. The Plaintiff has stated and provided evidence that she complained to Human Resources about what the Plaintiff had been experiencing in comparison to other classmates, namely Nathan Pfleger. (2) Instead of resolving the issue, the company fired her as a direct result of her complaints. No resolution came from her interaction with this department. Finally, (3) the connection is shown that when the Plaintiff complained the firing was immediate. As previously discussed, the firing was immediate with no buildup of firing like their handbook states. So, the connection of engaging in a statutorily protected activity and the subsequent adverse action of the Plaintiff being fired exists. The Court has, as a matter of course, held that "retaliation for complaining about race discrimination is 'discrimination based on race.'" Brief for United States as Amicus Curiae 14; see id., at 11-14; Brief for Respondent 16-19. Under Title VII, an adverse employment action "is a discriminatory act which adversely affects the terms, conditions and benefits of the plaintiff's employment." James v Booz-Allen & Hamilton, Inc., 368 F. 3d 371, 375 (4th Cir, 2004) (internal quotations omitted). The adverse employment is not just failure to promote or a decrease in compensation but also affects the terms and conditions of employment. So much so that the employee, Ms. Wilson suffered, "some significant detrimental effect," from the actions in question. These acts changed her condition of employment. These are not "minor incidents." How is getting fired a minor incident? The plaintiff provided direct evidence. Similarly-situated employees outside of the protected class received more favorable treatment, like Nathan. This is her job, her source of income. This is how she is fed. No one should have the right to fire an employee if she is doing her job correctly. Period. If Ms. Wilson was not fired for race, then what was she fired for? It wasn't because she couldn't pass the tests because someone

else could also not pass the test and she was in the meeting with her at the same time. Ms. Wilson wants to get an accurate grading on everyone in her class to see if they received a failing grade the first time they took the tests. Once fired, she no longer had the ability to reach out to HUMAN RESOURCES as a non-employee. The EEOC and HUMAN RESOURCES was the only infrastructure in place that Ms. Wilson had to reach out to. The Plaintiff understands that in jobs no one is equal because people have different job titles and different experiences, like maybe they were with the job before and they are in training as a refresher course. But by comparison Nathan was comparable in job specifics. And even though everyone is not equal, they should at least be civil. The actions committed by Verizon were not civil, which is why she has brought this Civil Complaint based on race. These actions were racially biased and should be brought to light.

What is a protected activity? Protected activity includes opposition to a practice believed to be unlawful discrimination or harassment. "Opposition" is informing or complaining to an employer that you believe that he/she is engaging in a prohibited discrimination or harassment. Complaining for the purposes of "protected activity" also includes filing a complaint with Human Resources, filing a charge with the Equal Employment Opportunity Commission, participating in a discrimination/harassment proceeding, or any other type of conduct opposing discrimination or harassment. What happened to the Plaintiff was unsolicited. HUMAN RESOURCES didn't even probe. Probing you used to clarify or discover additional information to ascertain whether racism took place. Now the Plaintiff can't highlight enough that HUMAN RESOURCES is in itself a department that specifically handles racism complaints. So, it is recognized by all parties that these complaints were not general. And the improper treatment did not need to be mentioned because the complaint was inherently assumed to be racial. The complaints would automatically be identified as racial in nature. So, her race did not need to be mentioned because it was already understood. So, any reasonable person could objectively believe from the facts that the Plaintiff's internal complaint was meant to oppose unlawful discrimination. If the Plaintiffs complaints were just general complaints she would go to the general Human Resources. But because her complaints were racial, she went to the racial department of Verizon.

The Plaintiff also had an objectively reasonable belief that the conduct that the Plaintiff opposed were racist because she was the only one who was having the issue of not going home.

So, these were not general complaints. These were serious complaints and discouraged her enough to make the Plaintiff reach out to HUMAN RESOURCES, knowing what the department was for. The materially adverse action of being fired is indeed retaliation. A rational jury could find from these facts that opposed race discrimination and discover that the that the Plaintiff was punished (fired) as a result of her complaints. A jury could find that Verizon was aware of her discrimination complaints and chose to fire her anyway. A jury could find that Verizon was unwilling to address the concerns about race discrimination that Ms. Wilson had. A jury could find that Verizon became increasingly aggravated as Ms. Wilson continued to bring up the subject of race discrimination. Finally, a jury could conclude that Ms. Wilson's speech was a substantial factor in the decision to remove her from her job. Ms. Wilson contends that her race discrimination claim was within the scope of her EEOC charge and that Verizon was aware of her race discrimination claims before they made the decision to fire her. "To state a prima facie

case of retaliation under Title VII, a plaintiff must proffer evidence that he engaged in a protected activity, such as complaining about race discrimination, and that his employer took an adverse action in retaliation. See Gorzynski, 596 F.3d at 110.  This is exactly what the Plaintiff did, she complained about race discrimination and she was fired as a result.

Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII), as amended, as it appears in volume 42 of the United States Code, beginning at section 2000e. Title VII prohibits employment discrimination based on race, color, religion, sex and national origin. The Civil Rights Act of 1991 (Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111-2) amend several sections of Title VII. In addition, section 102 of the CRA amends the Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII. This act was made to establish a Commission on Equal Employment Opportunity, and also for other purposes. VERIZON is subject to Title VII because they are an employer. Retaliation, which was done by VERIZON to the Plaintiff, is illegal and therefore the Plaintiffs' complaint is actionable. The retaliation was done when the Plaintiff made several complaints to HUMAN RESOURCES and facilitators about the way she had been treated. Title VII forbids employment discrimination based on "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a), and its anti-retaliation provision serves to "prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006); 42 U.S.C. § 2000e–3(a). Participating in a complaint process is protected from retaliation under all circumstances.  An employer is not allowed to do anything in response to EEO activity that would discourage someone from resisting or complaining about future discrimination.

A. Opposition Clause: The Plaintiff complained to HUMAN RESOURCES many times and internal investigation was opened; less than 2 months later the Plaintiff was fired immediately. Her complaint was a protected activity.

B. Negative Action: A materially adverse action against the Plaintiff that would deter anyone from making a complaint or otherwise engaging in a protected activity. Examples of the materially adverse actions include firing.

C. Causation: The Plaintiff complained to her supervisors and HUMAN RESOURCES and received a copious amount of backlash and workplace harassment.  And ultimately fired less than two months after the Plaintiff made the complaint. This negative action falls under timing because The Plaintiffs firing happened less than two months after the Plaintiff complained. This negative action of firing and workplace harassment also falls under knowledge. My supervisors, Human Resources and the company knew about my complaints and HUMAN RESOURCES claim or else she would not have been fired. So, the protected activity and negative action are connected. And, indeed, the Plaintiffs' conditions and benefits were altered or changed because of her race. Because the plaintiff faced all of the negative problems against her, Ms. Wilson has an objectively reasonable belief that the conduct that she opposed was illegal under Title VII.

These communications that the plaintiff had with VERIZON, HUMAN RESOURCES and her filing with the EEOC were not distinct incidents rather a continuous course of oppositional

conduct. Title VII's Opposition Clause, by its terms, prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e–3(a). The Supreme Court has defined "oppose" in this context by looking to its ordinary meaning: "to resist or antagonize .; to contend against; to confront; resist; withstand, . to be hostile or adverse to, as in opinion." Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 276 (2009) (internal citations omitted) (quoting Webster's New International Dictionary 1710 (2d ed.1958); Random House Dictionary of the English Language 1359 (2d ed.1987)). So, you can conclude that the threshold for oppositional conduct is not onerous. In fact, "[w]hen an employee communicates to her employer a belief that the employer has engaged in . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." Crawford, 555 U.S. at 276 (internal quotation marks omitted) (citing 2 EEOC Compliance Manual §§ 8–II–B(1), (2), p. 614:0003 (Mar.2003)). Oppositional Conduct "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir.1998); see also Collazo v. Bristol–Myers Squibb Mfg., Inc., 617 F.3d 39, 47–48 (1st Cir.2010) (recognizing that even non-verbal conduct may constitute protected activity); Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir.2009) (protected activity includes "complain [ing] about unlawful practices to a manager, the union, or other employees"); Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir.2006) (quoting Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir.2006)) (protected activity covers "informal protests of discriminatory employment practices[,] including making complaints to management"); McDonnell v. Cisneros, 84 F.3d 256, 262 (7th Cir.1996) (protected activity includes endeavoring to obtain an employer's compliance with Title VII). And while the oppositional activity must be directed to "an unlawful employment practice" under Title VII, 42 U.S.C. § 2000e–3(a), this Circuit's recent en banc opinion in Boyer–Liberto made clear that we should also interpret "unlawful employment practice" broadly. 786 F.3d at 282. Thus, "an employee is protected when she opposes 'not only . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful,' " and the Title VII violation to which the oppositional communication is directed "may be complete, or it may be in progress." (alterations in original) (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir.2005)).

In summary, nothing in the language of the Opposition Clause or in its interpretation by the courts supports a myopic analysis under which an employee's opposition must be evaluated as a series of discrete acts, 42 U.S.C. § 2000e–3(a). On the contrary, as the Third Circuit has observed in a similar context, "[t]hese determinations depend on the totality of the circumstances, as [a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Moore, 461 F.3d at 346 (second alteration in original) (citations and internal quotation marks omitted).

In the retaliation context, Title VII "must be read 'to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination,' because 'effective enforcement could . only be expected if employees felt free to approach officials with their grievances.' (alterations in original) (quoting Burlington N., 548

U.S. at 66–67); see also Thompson, 562 U.S. at 174 ("Title VII's anti-retaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' ") (quoting Burlington N., 548 U.S. at 68). So, You must examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole. Although individual acts may be scrutinized to ascertain their nature, purpose, and nexus to the alleged objective, the touchstone is whether the plaintiff's course of conduct as a whole (1) "communicates to her employer a belief that the employer has engaged in . a form of employment discrimination," Crawford, 555 U.S. at 276; and (2) concerns subject matter that is "actually unlawful under Title VII" or that the employee "reasonably believes to be unlawful," Boyer–Liberto, 786 F.3d at 282.

Of course, no one could mistake the claimants' alleged activities for "silent opposition." On the contrary, she asserts that she actively and deliberately communicated to VERIZON and in her own opinion these complaints were not properly handled. Thus, even assuming a threshold requirement that conduct be purposive to be protected under the Opposition Clause, the claimant's allegations easily clear that hurdle.

Also, the subject matter to which this conduct was directed in the complaint is sufficient. The claimant plausibly alleged that she directed her communications to practices that were "actually unlawful" or that, at a minimum, he "reasonably believe[d] to be unlawful," Boyer–Liberto, 786 F.3d at 282 (quoting Navy Fed., 424 F.3d at 406).

To the extent of the plaintiff's criticism of Verizon's' investigation or handling of Ms. Wilsons' complaints, you also can't frame this issue too narrowly.


**C.   Plaintiff States a Plausible Title VII Workplace Harassment Claim**

Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII), as amended, as it appears in volume 42 of the United States Code, beginning at section 2000e. Title VII prohibits employment discrimination based on race, color, religion, sex and national origin. The Civil Rights Act of 1991 (Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111-2) amend several sections of Title VII. In addition, section 102 of the CRA amends the Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII. This act was made to establish a Commission on Equal Employment Opportunity, and also for other purposes. VERIZON is subject to Title VII because they are an employer. Workplace harassment, done by VERIZON to the Plaintiff, is illegal and therefore the Plaintiffs' complaint is actionable. The Plaintiff faced unlawful harassment, which is illegal. Harassment is a form of employment discrimination that violates Title VII of the Civil Rights Act of 1964. Harassment is unwelcome conduct that is based on race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability or genetic information. Workplace harassment is the belittling or threatening behavior directed at an individual worker or a group of workers. Title VII of the

Civil Rights Act of 1964 is used as a tool to eradicate workplace harassment.[36] Title VII lists the following actions of employers unlawful:

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her or] his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; The Defendants discharged Ms. Wilson in November 2020.  or (2) to limit, segregate, or classify [her or] his employees discrimination based on race, color, religion, sex and national origin … in any way which would deprive... any individual of employment opportunities or otherwise adversely affect [her or] his status as an employee, because of such individual's race, color, religion, sex, or national origin." The firing of Ms. Wilson deprived her of employment opportunities and also adversely affected her status as an employee all because she complained about the racial mistreatment happening at VERIZON. Is it not severe and pervasive what happened to her? Getting fired because of your race not severe enough? Getting fired is a conclusion but its not an allegation. She was actually fired. Being racially harassed was not a conclusion. That actually happened. Generally, conduct "close enough [to unlawfulness] to support an objectively reasonable belief" will support a Title VII retaliation claim. See Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1311–12 (11th Cir. 2016) (quotation and citation omitted). Title VII must be read "to provide broader protection for victims of retaliation than for those [of] . . . discrimination," because "effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances." Id. at 66–67; see also Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 173–75 (2011).

Harassment becomes unlawful where 1) enduring the offensive conduct becomes a condition of continued employment. 2) the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive. The Plaintiff does feel that overall, the acts done by VERIZON were abusive to the point of creating a harassing work environment. Anti-discrimination laws also prohibit harassment against individuals in retaliation for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding, or lawsuit under these laws; or opposing employment practices that they reasonably believe discriminate against individuals, in violation of these laws. To be unlawful, the conduct must create a work environment that would be intimidating, hostile, or offensive to reasonable people. The employer is automatically liable for harassment by a supervisor that results in a negative employment action such as termination, failure to promote or hire, and loss of wages. If the supervisor's harassment results in a hostile work environment, the employer can avoid liability only if it can prove that: 1) it reasonably tried to prevent and promptly correct the harassing behavior, which VERIZON did not do. They did nothing to help Ms. Wilson with her complaints; and 2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. Ms. Wilson tried all advantages available and provided by the employer but unfortunately complaining to a supervisor and HUMAN RESOURCES did not prevail.  The employer will be liable for harassment by non-supervisory employees or non-employees over whom it has control if it knew, or should have known about the harassment and failed to take prompt and appropriate corrective action. With all of Ms. Wilsons complaints, VERIZON should have known about the racial discrimination that was happening to Ms. Wilson. The United States Supreme Court stated in *Oncale v. Sundowner Offshore Services, Inc.* shows that Title VII is "not a general civility

code." This case proves the Plaintiffs' claim in a nutshell. VERIZONs' conduct was so objectively offensive as to alter the conditions of the Plaintiffs' employment. The conditions of employment were altered because the harassment culminated in a tangible employment action (Plaintiff was fired) and was sufficiently severe or pervasive, which is what the Plaintiff describes in her complaint. A hostile work environment was characterized by conduct that related to the protected right of reporting to human resources. Legally, harassment is a form of racial discrimination. The employer is responsible for the harassment they knew about and they knew about everything that the Plaintiffs' manager and supervisors had done because the Plaintiff sent emails and complaints to human resources that were repeatedly ignored and their ignorance became a pattern. The Plaintiff was subjected to tangible employment action (as stated above in the causation under retaliation) due to the harassment. The company can act only through its managers and therefore has to be legally liable if those actions are negative. The company not responding to the Plaintiffs' complaints was clearly a pattern. So the company is liable for the workplace harassment.

The Plaintiff has proved (1) there was unwelcome conduct. *(2)* Because there was no other decisive factor other than race that stood apart from Ms. Wilson and the other employee, Page, Ms. Wilson could only conclude that race was the determinant factor in what happened to her and what got her fired. If her questions have been answered by VERIZON or by the facilitators then maybe she could consider a different reason. But because her questions were not answered and what was done to her was not explained she would have to conclude that race was the determinant factor because it was the only difference between Ms. Wilson and Page. (3) Ms. Wilson has proven that her work conditions were altered and created an abusive wok environment. *(4)* this was not imputable to Ms. Wilson.

In Count Three, the Plaintiff states workplace harassment. To prevail the Plaintiff will show there was (1) unwelcome conduct. The plaintiff has repeatedly given statements and proof that the incessant conduct by the defendants. The Plaintiff feels this conduct was illegal and abusive. (2) the Plaintiff believes these actions were also brought about because of her race, being African American. (3) Anything that is abusive is severe and these actions committed by Verizon did, in fact, alter the Plaintiff's employment. (4) All of this was imputable to Verizon. Verizon supervisors knew what was going on and they chose to use Ms. Wilson as a gaslighting opportunity. Racism takes many forms and making racial comments is not the only way to prove that someone is being prejudice, racist or discriminatory. Offhand comments can expose, bluntly, racism, but there are underlying ways that racism can occur. Systemic racism, for example, is giving money for schools in white neighborhoods and hardly anything for black neighborhoods when the same amount of money should be given for every school. Systemic racism blocks the goods, services and opportunities of our society. There is no such thing as "pockets of racism" because racism is structured in our society.  Another example would be harsh punishments for those who smoke weed (considered more prevalent in the black society) and lesser punishments for those who do meth or opioids (which are done predominately by whites). They are all drugs, why not give the same penalties for all? It could be something as simple as hairstyles, where rules are created to discourage people from styling their hair in particular ways. Creating rules where there should be no rules. Subtle forms of bias are called microaggressions or aversive

racism. Microaggressions harbor some degree of negative feelings toward blacks, whether they know it or not. Racism can never be justified.

In Count Three, the Defendants stated that the "Plaintiff does not allege that anyone at VERIZON made any comment about her race." The Plaintiff is taking that to imply that specific comments have to be made in order for racism to occur, no comment has to be made because racism comes in different forms. Like the workplace harassment that Ms. Wilson was experiencing. Harassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive, and harassment is objectively severe and pervasive if a reasonable person in the plaintiff's position would adjudge the harassment severe and pervasive." Jackson v. State of Alabama Corrections, 643 Fed.Appx. 889, 891 (11th Cir. 2016). When evaluating whether harassment is objectively severe and pervasive, "courts consider the frequency of the conduct; the severity of the conduct; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with the employee's job performance. The Plaintiff believes that the harassment happened because of her race.

## D.   Plaintiff States a Plausible Common Law Wrongful Termination Claim

Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII), as amended, as it appears in volume 42 of the United States Code, beginning at section 2000e. Title VII prohibits employment discrimination based on race, color, religion, sex and national origin. The Civil Rights Act of 1991 (Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111-2) amend several sections of Title VII. In addition, section 102 of the CRA amends the Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII. This act was made to establish a Commission on Equal

Employment Opportunity, and also for other purposes. BMS is subject to Title VII because they are an employer. Without question it is the policy of this Commonwealth that all individuals within this Commonwealth are entitled to pursue employment free of discrimination based on race. BMS wrongfully terminated the Plaintiff, which is illegal, and therefore the Plaintiffs' complaint is actionable. Under the Civil Rights Act of 1964, SEC. 2000e-2. *[Section 703]* under employment practices, states that It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; Federal and state law prohibit Virginia employers from discriminating against employees based on certain characteristics, such as race or religion. Virginia strictly adheres to the employment-at-will doctrine. See Stonega Coke Coal Co. V. Louisville N. R. Co., 106 Va. 223, 55 S.E. 551, 552 (1906). However, the Supreme Court of Virginia has recognized a narrow exception to that rule to allow for common law claims for wrongful terminations that violate the Commonwealth's

public policy. See Bowman v. State Bank of Keysville, 229 Va. 534, 331 S.E.2d 797 (1985). Such causes of action have come to be known as " Bowman claims." The plaintiff asserts that she was terminated in violation of her employment contract in the Personnel Handbook.

In Virginia, employment relationships are presumed to be "at will," which means that the employment term extends for an indefinite period and may be terminated by either party for any reason, or no reason at all, upon reasonable notice. Virginia courts "have strenuously adhered" to the presumption of at-will employment. *See Nguyen v.CNA Corp.*, 44 F.3d 234, 237-38 (4th Cir. 1995). Virginia courts have relied on an underlying theory that stresses the freedom of contract: "An employee is ordinarily at liberty to leave his employment for any reason or for no reason, upon giving reasonable notice, without incurring liability to his employer." *Miller v. SEVAMP, Inc.*, 362 S.E.2d 915, 917 (Va. 1987). In *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985), the Virginia Supreme Court first recognized a narrow public policy exception to the employment at-will doctrine, and held that the plaintiffs' employer was liable for wrongful discharge after it had terminated plaintiffs in violation of public policy. The court explained that the *Bowman* public policy exception is only recognized in 3 scenarios: (1) when an employer violated a policy enabling the exercise of an employee's statutorily created right; (2) when the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy; and (3) when the discharge was based on the employee's refusal to engage in a criminal act.

To succeed with this claim, however, the plaintiff must first establish the existence of an employment contract that altered his at-will employee status, and the facts do support any such contract. While an employee handbook may create a contract, this rule is limited and an employer may protect itself from liability by placing a clear and prominent disclaimer in the handbook. Bine v. Owens, 542 S.E.2d 842 (W. Va. 2000). The Bine Court determined that "nothing in the handbook was intended to alter Mr. Bine's at-will employment relationship," and granted summary judgment for the employer on a wrongful termination claim. The corporation's Personnel Handbook contains a similar acknowledgment and, while the plaintiff does not recall signing the acknowledgment specifically, she remembers receiving a copy of the Personnel Handbook. Ms. Wilson has exhausted all administrative remedies. While recognizing the at-will doctrine, the court held that the employee's complaint should not be dismissed without giving him an opportunity to prove at trial the existence of facts and circumstances which may show a definite employment contract. Verizon offended public policy and  her state law wrongful termination claim should have survived summary judgment as well. Under *Bowman v. State Bank of Keysville*, 229 Va. 534,331 S.E.2d 797 (1985), an at-will employee in Virginia may bring a common law claim of wrongful discharge if the employee's termination violates Virginia's public policy. While these types of claims are a "narrow" exception to the general rule of employment at-will, they may provide recourse for an employee whose termination violates a clear statement of Virginia public policy. The Supreme Court of Virginia has observed that "Virginia strongly adheres to the employment-at-will doctrine," whereby employment is presumed to last for an indefinite period and may be terminated at will by either employer or employee. *VanBuren v. Grubb*, 284 Va. 584, 733 S.E.2d 919, 921 (2012) (internal quotation marks omitted). In *Bowman*, however, the Supreme Court of Virginia recognized "a narrow exception to the employment-at-will rule." In that case, the Court permitted a bank's at-will

employees, who also owned shares of the bank's common stock, to bring claims against their former employer, the bank, which allegedly fired the stockholder employees in retaliation for their failure to vote in favor of the bank's proposed merger. *Bowman*, 331 S.E.2d at 800–01. The Court held that the at-will employees had a wrongful discharge claim because the alleged discharges violated the public policy of the Commonwealth as stated in Va. Code § 65.2-308. Discharge of employee for exercising rights prohibited; civil action; relief. The Court should reason that "[b]ecause the right conferred by statute is in furtherance of established public policy, the employer may not lawfully use the threat of discharge of an at-will employee as a device to control the otherwise unfettered discretion of a shareholder to vote freely his or her stock in the corporation." Therefore, under *Bowman*, an at-will employee may bring a common law claim of wrongful discharge if the employee's termination violates Virginia's public policy. *See Schmidt v. Bartech Grp., Inc.*, 119 F. Supp. 3d 374, 384 (E.D. Va. 2014), *aff'd*, 620 F. App'x 153 (4th Cir. 2015). Under the *Bowman* exception, employers are prohibited from "discharges which violate public policy, that is, the policy underlying existing laws designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." *Miller v. SEVAMP, Inc.*, 234 Va. 462, 362 S.E.2d 915, 918 (1987) (emphasis omitted). Virginia courts have recognized three categories in which an employee may demonstrate that his termination violates public policy under *Bowman*: when the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy. Notably, an employee plaintiff attempting to assert under *Bowman* a wrongful discharge claim in violation of public policy must "identify [a] Virginia statute establishing a public policy" that was violated by the employer. *Lawrence Chrysler Plymouth Corp. v. Brooks,* 251 Va. 94, 465 S.E.2d 806, 809 (1996). "While virtually every statute expresses a public policy of some sort, [the Supreme Court of Virginia] continue[s] to consider" the *Bowman* exception to be "narrow" because "termination of an employee in violation of the policy underlying any one statute does not automatically give rise to a common law cause of action for wrongful discharge." *Rowan,* 559 S.E.2d at 711 (internal brackets omitted) (quoting *City of Virginia Beach v. Harris,* 259 Va. 220, 523 S.E.2d 239, 245 (2000)). Rather, only in the three circumstances identified above has the Supreme Court of Virginia held that claims were sufficient to constitute a common law action for wrongful discharge under *Bowman*'s public policy exception.

In sum, under *Bowman* an at-will employee in Virginia may bring a common law claim of wrongful discharge if the employee's termination violates Virginia's public policy. While these types of claims are a "narrow" exception to the general rule of employment at-will, they provide some protection for an employee whose termination violates a clear statement of Virginia public policy and falls within one of the three categories identified in *Rowan*.

The employer cannot terminate employment because the employee is a certain race, nationality, religion, sex, age. Firing Ms. Wilson was illegal because it was done in retaliation and is therefore actionable. There was no reason to fire Ms. Wilson, but they did because she was African-American and they thought they could get away with firing her. An employer cannot fire an employee because the employee filed a claim of discrimination or is participating in an investigation for discrimination. In the US, this "retaliation" is forbidden under civil rights law. The absence of a formal contract of employment does not preclude wrongful dismissal in jurisdictions in which a *de facto* contract is taken to exist by virtue of the employment

relationship. Terms of such a contract may include obligations and rights outlined in an employee handbook. In the United States, termination of employment is not legal if it is based on your membership in a group protected from discrimination by law.[2] It is unlawful for an employer to terminate an employee based upon factors including employee's race, religion, national origin, gender, sexual orientation, disability, medical condition, pregnancy, or age (over 40), pursuant to U.S. federal laws such as Title VII of the Civil Rights Act of 1964.The ground for claiming wrongful termination in this case is because it was done in retaliation. Virginia has long adhered firmly to the doctrine of at-will employment. Lockhart v. Commonwealth Educ. Sys., 247 Va. 98, 102 (1994). Under that doctrine, at-will employment in Virginia is terminable at any time for any reason, or for no reason at all. Id. ("An employee is ordinarily at liberty to leave his employment for any reason . . . without incurring liability to his employer. Notions of fundamental fairness underlie the concept of mutuality which extends a corresponding freedom to the employer."). The Virginia Supreme Court has carved out an exception to this rule: an at-will employee may bring a "Bowman claim" for wrongful termination if the discharge violates Virginia public policy as expressed in a state statute. See Bowman v. State Bank of Keysville, 229 Va. 534, 540 (1985). The exception to Virginia's employment-at-will doctrine is, however, narrowly shown in three situations: (1) an employer violation of a policy enabling the exercise of an employee's statutorily created right; (Exhibit S) (2) an employer violation of a policy when the policy is expressly stated in a statute and the employee is clearly a member of the class entitled to the protection of that policy; and (3) discharge based on the employee's refusal to engage in a criminal act. Rowan v. Tractor Supply Co., 263 Va. 209, 213–14 (2002). (1) VERIZON clearly violates Ms. Wilson by firing her because she exercised her protected activity. (2). The employee is again, an African-American who is entitled to the protection to file a complaint about her employers' racial discrimination. (3) VERIZON stated that the claimant was fired for disrespect, which the Plaintiff states is not true. Ms. Wilson was fired for racial discrimination. Ms. Wilson refused to be silent about racial acts committed by the Defendant.

Under settled principles, an employee is guilty of "misconduct connected with his work" when he deliberately violates a company rule reasonably designed to protect the legitimate business interests of his employer, or when his acts or omissions are of such a nature or so recurrent as to manifest a willful disregard of those interests and the duties and obligations he owes his employer. Branch v. Va. Employment Comm'n, 219 Va. 609, 611, 249 S.E.2d 180, 182 (1978). Under Branch, misconduct is defined in the disjunctive so that either a deliberate violation of a rule or an act or omission showing willful disregard of the employer's interest disqualifies a claimant for benefits. When an employer adopts a rule, that rule defines the specific behavior considered to harm or to further the employer's interests. By definition, a violation of that rule disregards those interests. The rule violation prong, then, allows an employer to establish a prima facie case of misconduct simply by showing a deliberate act which contravenes a rule reasonably designed to protect business interests. Gantt, 7 Va. App. at 634-35, 376 S.E.2d at 811.

"[A] continuing recurrence of . violations over a period of time [may] clearly establish[ ] . a deliberate and willful misconduct." Robinson v. Hurst Harvey Oil, Inc., 12 Va.App. 936, 940, 407 S.E.2d 352, 354 (1991);  see Helmick v. Martinsville-Henry County Econ. Dev. Corp., 14 Va.App. 853, 421 S.E.2d 23 (1992);  Britt v. Va. Empl. Comm'n, 14 Va.App. 982, 420 S.E.2d 522 (1992).   However, the term " ' "misconduct" should not be so literally construed as to effect a forfeiture of benefits by an employee except in clear instances;  rather, the term should be

construed in a manner least favorable to working a forfeiture so as to minimize the penal character of the provision .' "  Cooper, 14 Va.App. at 707-08, 419 S.E.2d at 282 (quoting 76 Am.Jur.2d Unemployment Compensation §  77 (1992)).

With the company saying they fired Ms. Wilson because of disrespect, the firing would not be considered misconduct.

Various factors to be considered may include: the importance of the business interest at risk; the nature and purpose of the rule; prior enforcement of the rule; good cause to justify the violation; and consistency with other rules. Therefore, in order to constitute misconduct, the total circumstances must be sufficient to find a deliberate act of the **employee** which disregards the employer's business interest.

BMS clearly tried to engage in wrongful constructive dismissal and violated their very own contract they made and enforced, where they tried to make working conditions so intolerable that they would force the Plaintiff to resign. Since there was a collective bargaining agreement between the employer and the employees, those terms will govern the necessary considerations for termination. And Verizon did not enforce that agreement with her. As the Plaintiff stated though her complaint, her working environment was so unusually adverse that a reasonable employee in the Plaintiffs position would have felt compelled to resign. The employer intended to force her resignation and they also had knowledge of the intolerable working conditions and did not seek to correct the situation in any way. VERIZON offered no help. The negative conditions were clearly a pattern and they intended to maintain this hostile work environment until the Plaintiff quit. Because they could not get the Plaintiff to resign they committed wrongful termination.

The Plaintiff relied on all of the policies that the employer gave. Now that Ms. Wilson has been fired, they should pay damages. Now the promise was a condition of employment that the Plaintiff relied on and her reliance was reasonable. She ended up being injured or fired as a result. This is a wrongful firing because the employer represented a policy with one set of guidelines and then punished the Plaintiff with another set of guidelines while still having the first guideline in effect.

There are only three exceptions to "at will" employment in Virginia. One is when the person is entitled to protection under a certain statute – such as protecting someone asserting rights under the law. The Virginia Human Rights Act, or VHRA, has been modified to prohibit discrimination in the workplace based on religion, sex, national origin, pregnancy, marital status, race, color, etc. This is to prohibit wrongful termination claims on these bases and on the VHRA in general. Other remedies must prevail for a wrongful termination claim – such as being terminated. **Discrimination:** People who work for companies with fewer than 15 employees are not protected under the federal law that prohibits termination based on citizenship status, national origin, color, race, sex, genetic information, religion, disability or pregnancy. However, Virginia's antidiscrimination law has different terms. Companies that employ between six and 15

workers cannot terminate employees for any of the above protected traits except citizenship status, and Virginia does not allow discrimination based on marital status.

**Retaliation:** Retaliation is a punitive action against an employee who has performed a legally protected activity, and under most circumstances, it is considered a wrongful termination. For example, an employer cannot fire a worker who registers a safety violation complaint with OSHA or files for workers' compensation benefits.

**Public Policy:** Sometimes employees are granted rights based on Virginia's public policies. These refer to state laws that protect public interests, such as safety, health, property rights and personal freedoms. Examples of protected actions based on public policy include reporting for jury duty or refusing to engage in illegal activity.

In Bowman v. State Bank of Keysville, the Virginia Supreme Court first recognized an exception to the employment at-will doctrine based upon an employer's violation of public policy in the termination of an employee. Nonetheless, the at-will rule is not absolute. The unique facts of this case require us to apply one of the recognized exceptions to the rule of term inability. Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 427 A.2d 385 (1980) (at-will employee fired in retaliation for his insistence that his employer comply with state laws relating to food labelling). It is also illegal for business owners to dismiss an employee based on their race. There is no justifiable reason under any law to subject a worker to adverse treatment in the workplace based on this protected class and the Plaintiff is African-American. Virginia employees are protected against wrongful termination by several state and federal employment laws. There are certain protected factors which business owners are prohibited from citing as the reason for a worker's dismissal, such as gender, age, race, and more. It is wrong to terminate an employee in retaliation for raising concern regarding illegal conduct, filing a claim or complaint against an employer, which is what Ms. Wilson had done.

Plaintiff asserts common-law cause of action for wrongful termination stating her termination constituted discrimination based on race and that it violated public policy against retaliation for complaints of discrimination in employment as stated in the Virginia Human Rights Act and other provisions of Virginia and Federal law. Supreme court ruled that 1995 amendment to Virginia Human Rights Act limited actions based on violations of policies reflected in the Act to applicable statutory causes of action and remedies only. Because the Plaintiff asserts Common-law cause of action for wrongful termination the at-will policy should be abrogated.

The Plaintiff participated in a statutorily protected activity, she complained to Human Resources. Conduent concluded their inquiry in October, so from the conclusion of the matter to her being fired is less than one-month difference. And according to Bowman it is illegal to fire Mr. Wilson because she filed a complaint about racism. In Count Four, Verizon violated Virginia Human Rights Act Virginia code **§ 2.2-3901** when they discharged the Plaintiff. To assert the Bowman claim, the Plaintiff claims that this law was violated and this law that contains explicit statements of prohibiting firing and Virginia's at-will policy is what was also violated.

### E.    Plaintiff States Claim for Defamation

 Wikipedia defines deamation as, "**Defamation** is the act of communicating to a third party false statements about a person, place or thing that results in damage to its reputation.[1] It can be spoken (**slander**) or written (**libel**). It constitutes a tort or a crime."

To prove prima facie defamation, a plaintiff must show four things: 1) a false statement purporting to be fact. Beverly Arbor told BMS that I did not tell them that I was leaving. Which is false. It was malice because Mrs. Arbor should have known that it was the recruiters responsibility to advise them an employee is leaving. She abused her privilege; Ms. Wilson contends that they told BMS other things to get her fired from BMS 2) publication or communication of that statement to a third person; there was an email stating the fact that she did not tell them that she was leaving and It shook me to the point where I reached out to my recruiter to ask for clarification. 3) fault amounting to at least negligence; Ms. Wilson had to reach out to her recruiter and 4) damages, or some harm caused to the reputation of the person or entity who is the subject of the statement; Ms. Wilson was fired

### F.    Plaintiff States Plausible Intentional or Negligent Infliction Emotional Distress

Virginia recognizes a cause of action for intentional infliction of emotional distress. The elements of a prima facie case are (1) intentional or reckless conduct; Verizon fired Ms. Wilson out of retaliation (2) outrageous and intolerable conduct; Verizon subjected Ms. Wilson to workplace harassment (3) a causal connection between the alleged wrongful conduct and the emotional distress; Being without a job caused Ms. Wilson to be depressed and she had problems sleeping and (4) severe distress: the severe distress came when Ms. Wilson started experiencing headaches and also disappointment over being fired and worry about if she can get another job and if the job will pay enough. Also, constant worry about how she would pay her bills. The plaintiff brings an action for both intentional infliction of emotional distress and negligent infliction of emotional distress

> **Negligent infliction of emotional distress - Wikipedia**
>
> NIED began to develop in the late nineteenth century, but only in a very limited form, in the sense that plainti...

 (NIED). Because all elements can be proven in this case, Intentional Infliction of Emotional Distress is actionable. The plaintiff seeks recovery in damages for alleged intentional infliction of emotional distress, independent of any physical injury and unaccompanied by any physical

impact. We will consider the plaintiff's allegations according to "the settled rule that a demurrer admits the truth of all well-pleaded material facts. All reasonable factual inferences fairly and justly drawn from the facts alleged must be considered in aid of the pleading.

VERIZON rose to the level of extreme and outrageous conduct that exceeded all possible bounds of decency. The Plaintiff committed no conduct to warrant such behavior from VERIZON or BMS. All complaints made by the Plaintiff were valid and should have been brought to the employer's attention. Instead of trying to rectify the situation, the Defendants acted with intent or recklessness. They intended to cause severe emotional distress or known that it was happening and didn't stop this conduct because they wanted the Plaintiff to quit. The Plaintiff experienced embarrassment, fright and grief that no person should have to endure (*See all paperwork exhibits*). The Plaintiff experienced bodily harm, physical symptoms, like extreme headaches that were so insufferable that it was hard for the Plaintiff to do her job. Also, the longer the emotional disturbance continued, the more likely it is to constitute severe emotional distress. The Plaintiff alleges that by providing false information, VERIZON committed intentional infliction of emotional distress ("IIED"). This intentional tort requires proof of four elements: "1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." Almy v. Grisham, 639 S.E.2d 182, 186 (Va. 2007). Although "a plaintiff in Virginia state court must plead 'with the requisite degree of specificity' the facts giving rise to his claim of severe emotional distress," federal pleading rules apply in a diversity case such as this one. Hatfill v. New York Times Co., 416 F.3d 320, 337 (4th Cir. 2005). VERIZON's actions proves this intentional tort because their actions were reckless and their conduct was intolerable and their actions produced headaches for the claimant which made VERIZON's conduct severe. The Supreme Court of Virginia has said that "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it," Russo v. White, 400 S.E.2d 160, 163 (Va. 1991) She was fired (1) The lost wages (2) did not only result from the loss of her job, it also resulted in (3) emotional distress, like headaches, worry and sleeplessness. For all of the reasons stated above and no reasonable person should be expected to be subjected to wrongful termination just because of her race.

(4) Concluding, plaintiff alleged that, as a proximate result of defendant's "intentional acts," she suffered "severe emotional distress." This resulted, she asserts, in "nervousness, sleeplessness, embarrassment, worry, stress, mental suffering and its physical symptoms.

Academics take credit for the development of this modern tort, which was finally defined in the Restatement (Second) of Torts § 46 (1965) (hereinafter Restatement). Givelber, The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct, 82 Colum.L. Rev. 42, 42-43 (1982).

The term "emotional distress" travels under many labels, such as, "mental suffering, mental anguish, mental or nervous shock.... It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea."

Here, plaintiff alleged that she suffered "severe emotional distress" and "extreme emotional distress."

Even though the tort of intentional infliction of emotional distress is a disfavored cause of action, it remains a viable cause of action until it is abolished. The defendant's alleged conduct was so outrageous in character, and so extreme in degree, as to transcend all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Without question, VERIZON's alleged conduct was absurd, flagrant, intemperate, intentional, malicious, harassing, intimidating, annoying, childish, misguided, and reprehensible. VERIZON's conduct was beyond the "bounds of decency" and should not be tolerated in a civilized community. The defendant's acts were undertaken for the specific purpose of inflicting emotional distress upon them, and that the defendant intended their specific conduct and knew or should have known that emotional distress would likely result. This allegation, in my opinion, is sufficient at the demurrer stage of the proceedings.

In Count Five, the Plaintiff believes Conduent, BMS and Verizon's conduct was (1) reckless. (2) The conduct by Verizon was outrageous and intolerable. It was so intolerable that she reached out to HUMAN RESOURCES and told them that this conduct was unacceptable. She also used words like "harassment and "sue". (3) the connection between Verizon's conduct and emotional distress is clear. Verizon tried to disrupt the Plaintiffs learning, they tried to gaslight her and this caused her emotional distress. (4) the emotional distress was severe because it was intended to be severe. The physical injury caused was psychological. It made the Plaintiff question her ability and her reasoning. Gaslighting, is in itself, an abusive tactic that some abusers use to twist the victim's sense of reality.

The Plaintiff feel that abuse, in any form, is outrageous because there are other ways of handling a situation without being abusive, especially in the workplace. I was shocked that this was happening so blatantly. Verizon failed to use ordinary care, and therefore is negligent. Verizon violated **Code of Virginia § 8.01-221 of Virginia law and Virginias at will public policy.**

**Damages**

Punitive damages are available in tort cases in Virginia if the defendant acted with actual malice or under circumstances amounting to a willful and wanton disregard of a plaintiff's rights. Coalson v. Canchola, 287 Va. 242 (2014). Plaintiff is perusing damages under the willful and wanton disregard standard. The Supreme Court of Virginia has held that punitive damages may be based upon "such recklessness or negligence as to evince a conscious disregard of the rights of others." Hamilton Dev. Corp. v. Broad Rock Club, Inc., 248 Va. 40 (1994). These damages will be expressly pled in an *ad damnum.*

Smith v. Litten, 256 Va. 573 (1998) (approving jury instruction using that standard for punitive damages). The defendant has consciously disregarded the Plaintiff's property rights. Hamilton, supra. Punitive damage claims can even be given in the absence of pecuniary damages. Newspaper Publ'g Corp. v. Burke, 216 Va. 800 (1976). The plaintiff has established that these acts were done within the scope of employment and that the employer expressly authorized, participated in, or subsequently ratified, the act. Hogg v. Plant, 145 Va. 175 (1926). Ratification

occurred when the employer failed to act when informed of what occurred. The Plaintiff is not required to prove the defendant's financial standing in order to obtain punitive damages. Smith v. Litten, 256 Va. 573 (1998), if argued.

The Plaintiff has alleged tort claims for which punitive damages are recoverable. Kamlar Corp. v. Haley, 224 Va. 699 (1983). In addition to the monetary value of each claim, pain and suffering damages should also be awarded.

Damages should be awarded and should include: Back Pay, Front Pay, injunction relief, compensatory damages and punitive damages. The Plaintiff is seeking 20 million dollars in damages due to all of the reasons she is suing for and she definitely needs relief for VERIZON intentionally inflicting emotional distress.

The court has discretion under 42 U.S.C. § 2000e-5(g) to grant any equitable relief it deems appropriate. See Franks v. Bowman Transportation Company, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976); Albemarle Paper Co. v. Moody, supra note 6, 422 U.S. at 418, 95 S.Ct. at 2372; Fitzgerald v. Sirloin Stockade, Inc. 624 F.2d 945, 957 (10th Cir. 1980).

## CONCLUSION

For the reasons set forth above, plaintiff respectfully submits this complaint.